UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

Pensacola Division

CASE NO. 3:09-cv-00232-MCR-MD

STEPHEN BARDFIELD and CHARLES CARVER,

        Plaintiff,

v.

CHISHOLM PROPERTIES CIRCUIT EVENTS, LLC and
JOHNNY CHISHOLM, individually.

        Defendants.

_____/

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through their undersigned counsel, hereby file their Statement of Material Facts and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

## I.      INTRODUCTION

Defendants seek a summary judgment of all claims against them by re-characterizing the entire transaction between the parties as an illegal usurious loan made by a usurious lender to a desperate borrower. Other than taking exception to a fee they selected, Defendants have not offered any other undisputed evidence. Noticeably absent from Defendants' repugnant argument that they now should be permitted to walk away with a windfall due to their own fraud, is the undisputed testimony at the preliminary injunction hearing of their fraudulent actions and misrepresentations to extract sums of money from Plaintiffs that resulted in the granting of preliminary injunctive relief for Plaintiffs.

As the facts and law set forth below establish, Defendants' Motion for Summary Judgment fails not only because the issues on which it is based present triable issues of fact, but because usury law does not apply to the transaction between the parties.  Even assuming *arguendo* that such law does regulate the transaction between the parties, Defendants are estopped from raising this defense now and have also waived same.  In any event, as to Plaintiffs' claims under the Florida RICO statute and their claims of fraudulent inducement, unjust enrichment, conversion, and civil theft, these claims independently survive as it is well-settled by the Florida Supreme Court that the economic loss rule does not bar torts that are independent from the contract that was fraudulently obtained.

As such, Defendants' Motion for Summary Judgment must be denied.

## II.   PLAINTIFFS' STATEMENT OF CONTROVERTED MATERIAL FACTS

*Plaintiffs reprint Defendants' Statement of Facts in section A below with a designation following each fact as to whether such statement is disputed, undisputed or incomplete.  Because Defendants' Statement of Facts does not address the factual circumstances surrounding the fraudulent procurement of the transaction and the facts underlying the claims of fraudulent inducement, civil theft, conversion, unjust enrichment and the predicate acts underlying the RICO claim, Defendants' Statement is incomplete, and Plaintiffs hereby adopt and incorporate by reference all facts contained in their Verified Complaint as their Separate Statement of Facts in opposition to Defendants' Motion for Summary Judgment pursuant to Local Rule 56.1(A), reprinted in Section B below.*

### A.   *Defendants' Statement Controverted by Plaintiffs*

**Defendants' paragraph 1:**

Defendants executed a Promissory Note (the Note) and an addendum to same on February 20, 2009, for the principal amount of $200,000.  *Plaintiffs' verified complaint,* § 22; Exhibit A to verified complaint.

**Plaintiffs' Response:**

Undisputed.

**Defendants' Paragraph 2:**

The "fee" for the loan evidenced by the Note was $40,000.  *Plaintiffs' verified* complaint, § 22; Exhibit A to the verified complaint.

**Plaintiffs' Response:**

Undisputed.

**Defendants' Paragraph 3:**

The Note was payable in installments, pursuant to its terms, but all unpaid principal and the "fee" was due on or before June 15, 2009, a period of approximately four months.  Exhibit A to the verified complaint.

**Plaintiffs' Response:**

Disputed as incomplete and misleading.

The note also provided that the Plaintiffs were entitled to a percentage of the credit card sales generated by the event.

**Defendants' Paragraph 4:**

The effective annual percentage rate for the Note is 92.5662%.  Request for taking of judicial notice.

**Plaintiffs' Response:**

Disputed.  There was no annual percentage rate attached to the note.  For that matter, there was no interest at all.  The note only provided for a guaranteed fee on the investment.  Further, the taking of judicial notice on this point is improper, as it assumes that the transaction in question is the kind that would be subject to usury regulation.  In addition, assuming that it is appropriate to examine the transaction through a usury lens, Defendants do not provide any facts as to how they arrived at this calculation.

**Defendants' Paragraph 5:**

Plaintiffs and Defendants understood that the money evidenced by the Note must be repaid to Plaintiffs.

**Plaintiffs' Response:**

Undisputed.  Plaintiffs also state that it was understood that Plaintiffs had an interest in the credit card sales generated by the One Mighty Weekend Event.  (Exhibits A and B to Verified Complaint).

**Defendants' Paragraph 6:**

Defendants needed the loan from Plaintiffs because of a cash shortfall prior to the One Mighty Weekend events.  *Plaintiffs' verified complaint, §§20 and 21.*

**Plaintiffs' Response:**

Undisputed.   In addition, Defendants stated that all they needed was a guaranteed investment for a specific purpose, to fund Disney venue deposits (that Plaintiffs later found out to be untrue) and that based on the success of the event, including the representation that this year's event had already made more in advance ticket sales than it did last year, there would be plenty of money just before the events and more than enough to pay off all debts at the conclusion of the event.  (Bardfield Declaration at para. 3.)

**Defendants' Paragraph 7:**

The Note was originally drafted by Defendants, was reviewed by Plaintiffs' attorney and changes were made pursuant to Plaintiffs' wishes.  Changes to the original Note included the amount of the "fee" and the provision for the application of New York law.  The Addendum to the Note was drafted by Defendants, at Plaintiffs' request, to change the terms of the repayment of the Note.  *Plaintiffs' verified complaint, Exhibits A and B; affidavit of* Johnny Chisholm,

Exhibits B and C.

**Plaintiffs' Response:**

It is undisputed that the exhibits presented by Defendants establish that Defendants drew up the note, and contrary to Defendants' characterization otherwise, there was never a change to the fee that Defendants proposed in the subsequent draft.  Defendant Chisholm orchestrated the transaction and drew up the note himself with the fee of 20% he suggested.  Defendants 20% fee has been the same since their first call to Plaintiffs up to present day.  Mr. Chisholm represented himself as experienced in these matters and has drawn up notes such as the one he issued to Plaintiffs in his business dealings.  Plaintiffs relied on Mr. Chisholm to prepare the paperwork based on his representations that he was experienced in these matters.  Accordingly, on February 19, 2009, Mr. Chisholm sent Bardfield via electronic mail a Promissory Note and Personal Guarantee that he prepared containing his promise to repay the $200,000.00 with a 20% fee. (Bardfield Declaration at para. 6).

**Defendants' Paragraph 8:**

Plaintiffs knowingly, willingly, and purposefully charged and accepted consideration for the Note of $40,000.  *Plaintiffs' verified complaint, § 22 and prayers of Counts* I and VI.

**Plaintiffs' Response:**

Plaintiffs dispute this statement as Defendants have once again misrepresented the facts and allegations of the Complaint.  Plaintiffs had no intent in making a usurious loan, and due to the circumstances surrounding Defendants' procurement of the loan (Verified Complaint at para. 9-21; 24-25; Exhibits C and E of Verified Complaint and Bardfield Declaration at para. 9-12, 14-15, 24), the transaction at issue is not regulated by any usury law, as the memorandum of law

below demonstrates.  Plaintiffs also object to this statement of fact as argumentative and improper.  The questions of willfulness and intent in relation to Defendants' usury argument are issues of fact and cannot be resolved on a Motion for Summary Judgment.

**B.** **Plaintiff's Statement of Material Fact[1]**

**Fraud in the Inducement and Florida RICO (Fraud and Federal Wire Fraud)**

1.      Defendant Chisholm, the founder and producer of the "One Mighty Weekend" summer events at Orlando's Disney World and his company, Defendant Chisholm Properties Circuit Events, LLC, through one of their representatives, Mr. Thomas Sickler, an executive of a prominent gay magazine, approached Plaintiffs regarding obtaining some funds for the production of this event scheduled to take place the weekend of June 4, 2009.  (Verified Complaint at para. 9; Order Granting Motion for Preliminary Injunction ("Order") at page 3; Bardfield Declaration at para. 3).

2.      Typically the centerpiece of Gay Days are the One Mighty Weekend parties which have historically been held at Disney Parks.  (Verified Complaint at para. 12; Order at pages 1-2).

3.      Chisholm described the 2009 parties to Plaintiffs when trying to convince them to loan money to Chisholm Properties Circuit Events which was producing the parties.  (Verified Complaint at para. 13; Order at pages 3-4; Bardfield Declaration at para. 4-6).  (Carver hearing

---

[1] Defendants have not disputed the facts underlying Plaintiffs' claims under Florida RICO and claims of fraudulent inducement, civil theft, conversion and unjust enrichment nor can they now dispute the factual findings made by the Court in its Order Granting Plaintiffs' Motion for Preliminary Injunction.  Fed.R.Civ.P. 65(a)(2) provides that "evidence that is received on the motion [for preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."

testimony).

4.     Chisholm continually cited his close ties with Walt Disney World and his unique relationship based on years of trust.  (Verified Complaint at para. 14).

5.     The parties were described by Chisholm as historically generating approximately two million dollars.  (Verified Complaint at para. 19). (Carver hearing testimony).

6.     Defendants represented to Plaintiffs that they were in need of $200,000.00 to fund and finalize payment for the Disney venue deposits for the "One Mighty Weekend" events to be held in Disney World during the weekend of June 5, 2009.  (Verified Complaint at para. 20; Order at page 3).

7.     Defendants repeatedly told Plaintiffs how much cash and credit card sales he had at the conclusion of the weekend.  Defendant Chisholm told Plaintiffs he needed money now because he runs short of funds before the events but he always has plenty of money more than enough to pay off debts at the conclusion of the weekend.  (Verified Complaint at para. 21; Order at page 4).  (Carver hearing testimony).

8.     In connection with his efforts to induce the Plaintiffs to provide him the $200,000.00 payment, Defendant Chisholm provided them with a signed Personal Financial Statement on January 31, 2009, upon which they relied, certifying himself to be a person of means with a net worth of 11.6 million dollars.  (Carver hearing testimony).

9.     Plaintiffs subsequently became aware that Defendants submitted false information on such Statement by answering "No" to the question, "Are you a Defendant in any suits or legal action?". (Exh. C to Verified Complaint, para. 24; Bardfield Declaration at para. 8-9).  (Carver

hearing testimony).

10.     In fact, Defendant Chisholm was at that very time a Defendant, represented by counsel, in a federal lawsuit in the case of *Ray Deforest v. Johnny Chisholm Global Events, LLC and Johnny Chisholm, individually,* Case No. 3:08cv498-MRC/EMT, that was filed on October 31, 2008 and is currently pending in this Court; a case that alleges a similar pattern of fraudulent conduct and misappropriation of funds under the guise of an investment opportunity by Defendants.  (Ray Deforest hearing testimony).

11.     Defendants were also named Defendants in another lawsuit styled *McBride Construction Inc. v. Johnny Chisholm, Doyle G. Yeager, Emerald City of Pensacola, Inc., Chisholm Properties of Pensacola, LLC, Chisholm Properties Circuit Events, LLC*, Case No. 2005-CA-002063.  In this matter Defendants agreed to pay a settlement sum with money he did not have and has since filed bankruptcy on behalf Chisholm Properties of Pensacola, LLC and Emerald City of Pensacola.  Defendants further failed to list any legal claims under the Contingent Liabilities column of the Statement.  (Verified Complaint at para. 25; Order at page 4).

12.     Based on Defendants' representations concerning financial projections (Exh. E to Verified Complaint), the anticipated success of the event, Defendants' execution of the Promissory Notes (Exhibits A and B), Personal Financial Statement (Exh. C), and Defendant Chisholm's further execution of a Personal Guarantee on the Promissory Note (Exh. D), Plaintiffs released their money to Disney.  (Verified Complaint at para. 26; Bardfield Declaration at para. 9-10, 12).

13.     On March 18, 2009, after Plaintiffs had wired the funds to Disney, Defendants alerted the Plaintiffs that Disney might be returning their wires because such payments were not coming from Chisholm Properties Circuit Events with whom they had a previous relationship. (Verified Complaint at para. 27).

14.     "The similarities between the manner in which Chisholm induced Plaintiffs to invest in the Orlando OMW and DeForest in the Paris party suggest a "pattern" of fraudulent activity…" (Order at page 5.)

### Conversion, Civil Theft, Unjust Enrichment and Florida RICO (Theft)

15.     Once Disney returned the funds to Plaintiffs, Chisholm asked them on March 19, 2009 to wire the funds to the Chisholm Properties Circuit Events, LLC account with the representations that he would wire the funds to Disney immediately.  In emails sent to the Plaintiffs on March 18 and 19, 2009 and in telephone discussions with Plaintiffs, Chisholm stated that he would be sending his bank account wiring instructions only after he had confirmed the Disney venues were secure.  (Verified Complaint at para. 28).  (Carver hearing testimony).

16.     Chisholm also asked Plaintiffs to consider loaning him an additional $100,000.00 to purportedly cover Disney's revised increased deposit requirement so that he could "seal the deal" with Disney.  (Carver hearing testimony).

17.     Chisholm attempted to offer Plaintiffs more money, this time, 25%, if they loaned him this sum.  (Bardfield Declaration at para. 14; Exh. C to Bardfield Declaration).

18.     Chisholm then sent Plaintiffs another email offering up that "the 25% interest would be on the entire loan of $300,000.00 not just the $100,000.00." (Bardfield Declaration at

para. 15; Exh. D to Bardfield Declaration).

19.    On March 25, 2009, Chisholm asked Plaintiffs again whether they would loan him additional money, this time, $50,000.00, and he offered up to "pay 25% on the entire loan instead of the initial 20% that is in place now which would give you an additional $12,500.00 *on your return* on top of the original $40,000.00 for a total of $52,500.00 *on your investment*." (Bardfiield Declaration at para. 17; Exh. E to Bardfield Declaration.)

20.    Defendants acknowledged to Plaintiffs for the first time, that Plaintiffs' $200,000.00 loan did not "finalize" full payment to Disney.   Plaintiffs refused to provide Defendants with additional funds and asked Defendants, on March 24, 2009, prior to wiring their $200,000.00, whether the Disney venues, which were the basis for their loan, and their loan, were in jeopardy due to the status of Defendants' negotiations with Disney and Defendants' request for additional money from Plaintiffs.   Defendants replied and assured Plaintiffs that he would not release their money until he worked everything out with Disney.   Chisholm emphatically assured them Disney would be secure and understood their loan was based on the parties being held at Disney.   Defendants specifically informed Plaintiffs, via an email on March 24, 2009, that their $200,000.00 was not at risk (Exh. F to Verified Complaint, Verified Complaint at para. 29).   (Carver hearing testimony).

21.    On March 30, 2009, Defendants informed Plaintiffs that he had "worked it out with Disney" and instructed them to wire the funds into his account (Bardfield Declaration at para. 19; Exh. G to Verified Complaint; Order at page 4).   (Carver hearing testimony).

22.    Prior to wiring the funds to Defendants, Plaintiff Carver phoned Defendant

Chisholm to be certain contract and deposit requirements had been worked out with Disney and that the $200,000.00 Plaintiff was planning to wire to Defendant would be redirected to Disney as soon as it posted to Defendants' bank account. Defendants assured Plaintiffs that they would send those funds to Disney as soon as they were received in his account and gave Plaintiff assurance that he would produce a wire confirmation as proof that Disney was the final recipient of their $200,000.00.  Based on such representations by Defendants, Plaintiffs wired the funds to Defendants.  (Verified Complaint at para. 31; Order at page 4).  (Carver hearing testimony).

23.     To their shock, within a week of wiring the $200,000.00 to Defendants, rumors surfaced that negotiations with Disney were in trouble.  Plaintiffs subsequently received information that the One Mighty Weekend event would not take place at Disney venues as advertised in several public forums, including websites, and as represented to Plaintiffs by Defendants.  Plaintiffs made several efforts to contact Defendants to ascertain the status of the event, and on April 26, 2009, sent an e-mail to Defendants requesting information.  At no time prior to their inquiry were Plaintiffs ever advised by Defendants that the OMW parties were not going to be held at Disney Parks or that Defendants never redirected the $200,000.00 proceeds to Disney despite it being a condition of the loan.  (Verified Complaint at para. 32; Bardfield Declaration at para. 19).  (Carver hearing testimony).

24.     Defendants callously admitted to unilaterally converting and keeping the money without ever seeking prior approval or authorization from Plaintiffs ignoring their agreement, and Defendant Chisholm used his own "discretion," in taking Plaintiffs' money.  He claimed to apply those funds for alternate venues and securing more talent for the event but has never

shown any such documentation.   (Exh. H to Verified Complaint at para. 33; Bardfield Declaration at para. 19).  (Carver hearing testimony).

25.      On April 30, 2009, Plaintiffs responded to Defendants and threatened both legal and criminal action for Defendants' fraudulent procurement of their money.  (Exh. H to Verified Complaint at para. 34).  (Carver hearing testimony).

26.      Plaintiffs asked for a return of their money which they viewed at a minimum to have been fraudulently obtained.  (Verified Complaint at para. 35).  (Carver hearing testimony).

*Promissory Note*

27.      It is undisputed that the exhibits presented by Defendants establish that Defendants drew up the note (Exhibit A to Bardfield Declaration), and contrary to Defendants' characterization otherwise, there was never a change to the fee. (Exhibit B). Defendant Chisholm orchestrated the transaction and drew up the note himself with the fee of 20% that he suggested. From his initial contact, Chisholm always set forth the financial amount and fee which never changed and were predicated on his representation that Plaintiffs had a 25% interest in all credit card proceeds.  Mr. Chisholm represented himself as experienced in these matters and has drawn up notes such as the one he issued to Plaintiffs in his business dealings.  Plaintiffs relied on Chisholm to prepare the paperwork based on his representations that he was experienced in these matters.  (Bardfield Declaration at para. 7, 12 and Exhibit A attached thereto). (Carver hearing testimony).

28.      Accordingly, on February 19, 2009, Chisholm sent Plaintiff Bardfield via electronic mail a Promissory Note and Personal Guarantee that Chisholm prepared containing his promise to repay the $200,000.00 with the 20% fee.  (Bardfield Declaration at para. 7, 12 and Exhibit A attached thereto).  (Carver hearing testimony).

29.     Plaintiffs did not have any intent to make a usurious loan.  (Bardfield Declaration at para. 24).

30.     Defendants even paid a nominal installment due on the note in April 2009 in the amount of $12,000.00.  (Exh. F to Bardfield Declaration).  Defendants told Plaintiffs that he was making such payment as proof of Defendants' intent to pay under the terms agreed upon. (Bardfield Declaration at para. 21).  Chisholm and his counsel confirmed that Plaintiffs were entitled to a security interest in the credit card sales of the event (Exh. A, C and D to Motion for Temporary Restraining Order).

31.     "The similarities between the manner in which Chisholm induced Plaintiffs to invest in the Orlando OMW and DeForest in the Paris party suggest a "pattern" of fraudulent activity…" (Order at page 5.)

## III.     STANDARD ON DETERMINING A MOTION FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

In a case like here, where a party asserts a usury defense, such defense raises a genuine

issue of material fact making disposition by summary judgment improper. *See Frey v. Malrath Real Estate Development Corporation*, 605 N.Y.S.2d 451 (N.Y. 1993)(denying summary judgment, finding that usury will not be presumed and defendant must prove same by clear and convincing evidence); *see also,Greenfield v. Skydell,* 186 A.D. 2d 391, 588 N.Y.S. 2d 185 (1992) ("A defendant seeking to interpose the defense of usury must prove all of the essential elements thereof by clear evidence.") (internal citation omitted). *Wong v. Lam*, 2002 WL 31680800 (Bkrtcy.S.D.N.Y. 2002)(denying summary judgment in favor of borrower by reason of issues of fact as to estoppel in pais); *Greenfield v. Skydell*, 588 N.Y.S.2d 185 (N.Y. A.D. 1992).  The issue of a lender's intent is the responsibility of the trier of fact. *Szenay v. Schaub*, 496 So. 2d 883 (Fla. 2d DCA 1986).

    **IV.**    **ARGUMENT**

    **A.**    **The transaction between these parties is not subject to or regulated by any usury law, as such transaction was for a guaranteed fee, proposed by the Defendants.**

Defendants, now, for the first time, seek to re-characterize their relationship with Plaintiffs as one of a desperate person who fell victim to a usurious lender.  Defendants' argument is belied by the record facts—facts which the Court found sufficient to grant injunctive relief under Florida RICO law due to Defendants' underlying and predicate acts of theft, fraud, and federal wire fraud.  Based on the existence of these facts, which are noticeably absent from Defendants' Motion for Summary Judgment, usury law does not apply nor does it regulate the transaction at issue in this case, and genuine issues of material fact preclude disposition by summary judgment.  Defendants' undisputed acts of fraud and deceit certainly do not portray Chisholm as a victim, and more to the point, Chisholm claimed to have significant wealth describing the need for money for a very limited purpose.  Assuring payment out of guaranteed

profits for a man of great wealth is far from "desperate."

It is well-established that usury laws do not apply to business transactions, like the present one, that are not loans[2].  *See* General Obligations Law Sec. 5-501(1) and (2) and Fla. Stat. §687.02.

In the seminal case of *Orviss v. Curtiss*, 157 N.Y. 657, 661 (N.Y. 1899), cited by *Seidel, et. al. v. 18 East 17th Street Owners, Inc., et. al.*, 79 N.Y. 2d 735 (1992), upon which Defendants' instant motion heavily relies, the Court noted the distinction that if the transaction is not a loan, there can be no usury, however unconscionable the contract may be, and courts examine the facts underlying the transaction rather than how the transaction is labeled in order to determine its true nature.  Oddly, Defendants cite to these cases wherein the Court found usury inapplicable.

Even in Florida, courts also look at the substance of a transaction, rather than its form, to determine whether a usurious loan exists.  *See Florida Trading and Inv. Co., Inc. v. River Const. Services, Inc.*, 537 So. 2d 600 (Fla. 2d DCA 1988), citing *Growth Leasing, Ltd. v. Gulfview Advertiser, Inc.*, 448 So. 2d 1224 (Fla. 2d DCA 1984) and *Goodman v. Olsen*, 305 So. 2d 753 (Fla. 1974).  In *Florida Trading*, the Court found that a transaction was a joint venture rather than a loan.  For a transaction to be labeled usurious there must be a loan, either expressly or impliedly created, an understanding that the money is to be repaid at a rate greater than allowed by law, and a corrupt intent on the part of the lender to extract more than the legal rate of interest. *Id.*

More specifically, in *Orviss*, the plaintiff's purpose was to buy stocks at the defendant's risk, securing to his firm the commissions and interest on the investment, and plaintiff took care to make such an agreement with the defendant as would exempt him from all possible loss and to

---

2   As the Promissory Note provides, New York law governs this issue.  *See also Goodman v. Olsen*, 305 So. 2d 753 (Fla. 1974)(applying New York law).

secure him a large profit.  The court found that the transaction was in reality a joint venture or partnership between two persons to deal in property in order to make profit and that the plaintiff merely protected himself to guarantee himself a profit in the transaction.  The Court found that an agreement between two parties regarding the purchase or sale of stocks or other property is a very common transaction and the fact that one of them may have advanced the capital and the other agreed that in consideration of such advance he should participate more largely in the profits, which in that case, a return was guaranteed, did not convert the agreement into a loan of money or conflict with the usury statute.  As such, the defense of usury was not applicable to such transactions.

So too are the circumstances in the instant case where, by Defendants' own admissions, Plaintiffs were induced in a business transaction and Plaintiffs were guaranteed a return of twenty percent.  Defendants cannot now attempt to conveniently and disingenuously hide behind their own classification of this venture as a "loan," governed by usury in order to receive a windfall by not having to repay Plaintiffs.  Both the law cited herein and doctrines of equity dictate otherwise.  Defendants simply cannot be rewarded for their own fraudulent schemes and after they are "caught," attempt to play fast and loose with the law in order to get out from under their obligations, the terms and conditions of which Defendants dictated.

Additionally, in *Salter v. Havivi*, 215 N.Y. S. 2d 913 (N.Y. Sup. 1961), the Court, applying *Orviss*, examined the facts underlying the transaction and noted that that whether a transaction is called a loan, an advance, an investment, a partnership or anything else is not determinative of the issue.  In determining that a business transaction, rather than a usurious loan, existed, the Court listed several indicia that were reflective of a transaction of a business partnership rather than a loan, including the defendant's own writings to plaintiff, after the

16

money was advanced.   In the present case, while Plaintiffs own no part of Defendants' enterprises, it is undisputed that Defendants kept writing Plaintiffs confirming their offer to pay the agreed upon 20% fee and in fact offering even greater fees.   *Salter* is also similar to the facts of the instant case in that the defendant kept the plaintiff apprised of the business, made assurances that business was good, "all in all it looks good-so don't worry, it will be alright," and a pattern of consultation between the parties as to promotion and sales.   Even though it now appears such claims may have been fraudulent, Defendants kept remarking how OMW presales were ahead and venues and headliners were secure.

In the instant case, aside from the fact that Defendants lured the Plaintiffs into a transaction and agreement by fraud, which will be addressed in Section B below, and assuming that the agreement deserves the assumption that it was legitimately obtained, the transaction was of a kind where the Plaintiffs here, like the plaintiff in *Orviss* and *Salter*, entered into a transaction with Defendants for the production of the One Mighty Weekend Event which would not be under usury laws.   The fact that Plaintiffs advanced the Disney venue deposits and in consideration of such advance, Defendants guaranteed to Plaintiffs a $40,000.00 return, does not convert the agreement into the kind of loan that would be subject to the usury statute.   To the contrary, the evidence in this case shows that the reality of the transaction was that Plaintiffs had an interest in the event, as represented by the interest they held in the actual credit card sales of the event, where they were to receive 25% of those sales (Exhibits A and B of Verified Complaint).   Defendants' own words and conduct toward Plaintiffs also illustrate the nature of the transaction, where Defendants, when they tried to obtain more money, offered Plaintiffs 20% to an additional $12,500.00 *on your return* on top of the original $40,000.00 for a total of $52,500.00 *on your investment*"(emphasis added), and Defendants kept assuring Plaintiffs of the

status of the sales during the event.  Exh. E to Bardfield Declaration.

The Court, in its Order Granting Plaintiffs' Motion for Preliminary Injunction, noted that "the evidence indicates a pattern of misleading statements that induced plaintiffs to invest in the OMW event. 'It is in the interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers from benefitting from their deceit.'" *Order at 6*, citing *S.E.C. v. Asset Recovery and Mgt. Trust, S.A.*, 340 F.Supp.2d 1305, 1311 (M.D. Ala. 2004).

In *Orviss*, the Court also considered the question of whether the agreement (i.e., the note) between the parties, was, as a matter of law, usurious.  There, the Court found that the transaction was not subject to usury law because the plaintiff did not have a corrupt purpose or intent to secure an illegal rate of interest for the loan or forbearance of money.  "There must be a lender and a borrower, and it must appear that the real purpose of the negotiations and transactions was, on the one side to loan money at usurious interest reserved in some form by the contract, and on the other side to borrow upon the usurious terms dictated by the lender." *Orviss* at 661.  Again, and as stated *supra*, Plaintiffs in the case at bar certainly had no usurious intent or corrupt purpose in "loaning" money to Defendants where it was Defendants who drafted the "note" and dictated its terms and conditions, including but not limited to, a fixed rate of return.  Defendants cannot now have their fraudulent inducements in having Plaintiffs "loan" money to or "invest" money with Defendants, inure to the detriment of Plaintiffs in order to gain a financial windfall.

Defendants' about-face at this time to argue otherwise is the proverbial attempt to fit a square peg into a round hole for the sole repulsive purpose of obtaining an inequitable windfall.

**B.      Assuming *arguendo* that the transaction is regulated by usury law, there are triable issues of fact precluding summary judgment, including that Defendants are estopped to assert usury and/or have waived usury as a defense, as the very transaction at issue was procured by Defendants' own fraud**

The legislative purpose of New York's usury statutes is "to protect desperately poor

people from the consequences of their own desperation." *Seidel v. 18 East 17th Street Owners, Inc*., 79 N.Y.2d 735, 586 N.Y.S.2d 240, 598 N.E.2d 7, 9 (N.Y. 1992) (quoting *Schneider v. Phelps*, 41 N.Y.2d 238, 243, 391 N.Y.S.2d 568, 359 N.E.2d 1361 (N.Y. 1977)).   The usury defense does not apply to corporations and limited liability companies. *See*, GOL § 5-521; N.Y Ltd. Liab. Co. § 1104 (2009).  While a criminal usury defense may be available, such defense is not absolute.

The very cases Defendants cite establish the many exceptions a court will consider before permitting a usury defense by a defendant.   At a minimum, courts have denied summary judgment in cases where this defense is presented due to the questions of fact that it raises.  *See Frey v. Malrath Real Estate Development Corporation*, 605 N.Y.S.2d 451 (N.Y. A.D. 1993)(denying summary judgment, finding that usury will not be presumed and defendant must prove same by clear and convincing evidence); *Wong v. Lam*, 2002 WL 31680800 (Bkrtcy.S.D.N.Y. 2002)(denying summary judgment in favor of borrower by reason of issues of fact as to estoppel in pais).

The weak nature of Defendants' motion is evidenced by their acknowledgement of *Greenfield v. Skydell,* 186 a.d. 2D 391, 588 n.y.s. 2D 185 (1992), and their hollow attempt to distinguish *Greenfield* from the case at bar.   Defendants fail to do so.   First and foremost, *Greenfield* acknowledges that a defendant must prove usury by clear evidence which they have failed to do.  Defendants also ignore the fundamental premise of *Greenfield* that "The court will not assume that the parties entered into a unlawful agreement and when the terms of the agreement are in issue, as they are here, and the evidence is conflicting, the lender is entitled to a presumption that he did not make a loan at a usurious rate."  *Id.* at 391; *Giluenter v. Arnow,* 37 N.Y. 2d 305, 309.  Defendants also fail to distinguish *Greenfield* by ignoring that the note does

not provide an interest rate. The fee here was offered by Defendants and does not change or grow on its terms after payment is due. The fee is not interest as claimed now by Defendants. Further, the estoppel issues in *Greenfield* are clearly present here. Despite Defendants hollow assertion without any basis, Plaintiffs were not sophisticated borrowers who negotiated the alleged usurious terms. Declaration of Stephen Bardfield at para 9 and 14. Similarly, Defendants in this case, based on their fraudulent representations and history of past unpaid loans and guarantees, appear to be preying on unsuspecting innocent persons who did not know that they were loaning money under a note which by its own terms might be unenforceable. In fact, Plaintiffs resemble the victims in *Greenfield* in that they allege and the Court has made significant findings on Defendants' fraudulent inducement and Defendants drafted the documents they now seek to void. Defendants in the present case must have hoped to somehow distinguish *Greenfield* and to be permitted to "achieve a total windfall at the expense of an innocent person through (their) own subterfuge and inequitable deception, a result which does not appear to be required in order to fulfill the public policy and purposes of the usury laws." *Greenfield* at 392; *Angelo v. Brenner*, 90 A.D. 2d 131, 132-133 (N.Y. App. Div. 1982).

Defendants' construction of *Greenfield* is wrong, and *Greenfield* itself provides that a "Plaintiff's assertion of estoppel is not precluded by the fact that defendants allege criminal rather than civil usury."

Here, the record facts thus far, which have not been refuted by Defendants either at the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction or in their summary judgment papers, establish a genuine triable issue that Defendants were desperate, poor borrowers that the usury laws were enacted to protect. Rather, Defendants were predators who engaged in a pattern and practice of victimizing people with their representations of wealth and

profitable business ventures who are estopped from asserting such a defense.   (Bardfield

Declaration at para. 3-6, 8-11, Verified Complaint at para. 19, 21, 24-26).   "The similarities

between the manner in which Chisholm induced plaintiffs to invest in the Orlando OMW and

DeForest in the Paris party suggest a "pattern" of fraudulent activity under RICO." (Order at

page 5).

In *Keezing v. Rodriguez,* 765 N.Y.S.2d 196 (N.Y. Sup. 2003)*,* the court, while recognizing

that usury laws apply only to loans and forbearances, not investments, found, applying estoppel

in pais, that it is equally the case that "a party will be concluded [sic] from denying his own acts

or admissions which were expressly designed to influence the contract of another, and did so

influence it, and when such denial will operate to the injury of the latter." (internal citations

omitted).  The Court, finding that the transaction was of defendant's making and that he authored

the transactional document, estopped the defendant from asserting a usury defense.  Such is also

the circumstances in the case at bar where the "transaction" was of Chisholm's making, that he

authored the "note," and as such, Defendants are estopped from asserting a usury defense.  To

allow such a disingenuous defense under these circumstances will improperly permit Defendants

to profit from their own acts of wrongdoing and will operate to injure Plaintiffs.

Unlike *Seidel* where the plaintiff was not injured by the defendant's conduct in that the

plaintiff recouped the principal and had realized at least $312,000.00 of her initial outlay of

$150,000.00, the plaintiff in *Keezing* was injured in that he suffered a loss of all but $5,000.00 of

a $25,000.00 loan.  The Court in *Keezing* determined that "inasmuch as the transaction was the

brainchild of the defendant, equity dictates that the plaintiff is entitled to recovery of the

outstanding balance of the amount advanced, with legal interest."

In the case at bar, as was the case in *Keezing*, Plaintiffs have only received a nominal

payment (i.e., $12,001.00 out of the $200,000.00 they advanced to Defendants) (Bardfield Declaration at para. 24), and equity dictates that Defendants be estopped from claiming usury, as they orchestrated the transaction and proposed the fee.   Consequently, Plaintiffs should be permitted to recoup the outstanding balance of the amount advanced, with legal interest.   *See also Angelo v. Brenner,* 457 N.Y.S.2d 630 (N.Y. A.D.1982)(a triable issue of fact requiring trial existed on whether the facts established an estoppel in pais that would prevent the defendant from achieving a total windfall, at the expense of an innocent person, through his own subterfuge and inequitable deception).

In addition, because Defendants had previously made a partial payment on the "note" by paying $12,001.00 as the first installment in April 2009, they have waived any objection that the note that they made partial payment on is in any way improper.   *See Howard v. Kirkpatrick, et. al.*, 31 N.Y.S.2d 182 (N.Y.A.D. 1941)(the defense of usury is personal and may be waived by the borrower); and *Seidel* (the defense may be waived and the borrower may be estopped from asserting it).

Because these facts establish estoppel and waiver in the context of New York law, these facts also undermine the establishment of a usury defense under Florida law, which purpose is to "bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in making of loans."   *Dixon v. Sharp,* 276 So. 2d 817, 820 (Fla. 1973), *citing Chandler v. Kendrick*, 146 So. at 551 (Fla. 1933).   Further, Florida also recognizes waiver by a borrower of a usury defense, *Munilla v. Perez-Cobo*, 335 So. 2d 584 (Fla. 3d DCA 1976), and estoppel, *First American Bank and Trust v. International Medical Centers, Inc.*, 565 So. 2d 1369 (Fla. 1st DCA 1990), and the issue of a lender's intent is the responsibility of the trier of fact. *Szenay v. Schaub*, 496 So. 2d 883 (Fla. 2d DCA 1986).

C.     **Even if usury law applies without any exception, it is not clear whether such a defense results in the cancellation of the interest obligation or voids the entire agreement.**

As the Court noted in dictum in *In Re Venture Mortgage Fund, L.P.,* 282 F.3d 185 (2d Cir. 2002), "a close reading of the complex and cross-referencing statutes that compose New York's usury law [shows] that the voiding provision only operates to void loans that violate the civil usury statute" and that "nothing we see in the criminal usury statute, N.Y. Penal Law § 190.40 (McKinney 2001), provides for voiding...[and] it is an open question under New York law whether a criminally usurious loan is void."

Even if it is determined that a criminally usurious loan exists, which Plaintiffs deny, the equities of the situation require Defendants, at a minimum, to return the outstanding principal to Plaintiffs with legal interest.

D.     **The Economic-Loss Doctrine does not bar Plaintiff's claims under the Florida RICO statute and their claims of fraudulent inducement, unjust enrichment, conversion, and civil theft, as they are torts independent from the contract**

Even if the "promissory note" is voided, Plaintiffs' other claims of fraudulent inducement, unjust enrichment, conversion, civil theft, and Florida RICO survive independently. Defendants neglect to cite to the Florida Supreme Court case of *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238 (Fla. 1996) where the Court held that a claim for fraudulent inducement constituted a tort independent from the underlying contract and, therefore, was not barred by the economic loss rule.

The Court noted, "The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract." *Id.* at 1239. *See also Woodson v. Martin*,

685 So. 2d 1240 (Fla. 1996), *PK Ventures, Inc. v. Raymond James & Associates, Inc*., 690 So. 2d 1296 (Fla. 1997) and *Moransais v. Heathman*, 744 So. 2d 973, 982 (Fla. 1999)(discussing Florida Supreme Court's determination to limit the application and reach of the economic loss rule).  In the instant case, the established facts are clear that Defendants engaged in independent tortious acts separate and apart from their obvious breach of their obligations under the "note."

In *Pershing Indus., Inc. v. Estate of Sanz*, 740 So. 2d 1246, 1248 (Fla. 3d DCA 1999), the Court held that claims for economic damage based on fraud in the inducement, conversion, and civil theft were independent torts and thus actionable despite existence of contract between the parties and observed that "this court has consistently held that the economic loss rule does not preclude independent tort claims that fall outside the scope of a breach of contract," citing *Alex Hofrichter, P.A. v. Zuckerman & Venditti, P.A*., 710 So. 2d 127 (Fla. 3d DCA) (where defendant, by intentional misconduct, converted plaintiff's property to his own use, the Court determined that this was more than a claim for a simple breach of contract and actions for conversion and civil theft were not barred by economic loss rule);  *Escudero v. Hasbun*, 689 So. 2d 1144 (Fla. 3d DCA 1997); *Burke v. Napieracz*, 674 So. 2d 756, 758 (Fla. 1st DCA 1996)(where the defendant's acts were "not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies to which he was entrusted, there is not merely a breach of contract but a separate and independent tort." In *All Care Nursing Serv. v. High Tech Staffing*, 135 F.3d 740, 745 (11th Cir. 1998), the Eleventh Circuit held that the economic-loss rule does not bar Florida RICO claims.  *See also Wilson v. DeAngelis*, 156 F.Supp.2d 1335 (S.D. Fla. 2001), citing and concluding same.

Even in *Indemnity Ins. Co. of North America v. American Aviation, Inc.* 891 So.2d 532 (Fla. 2004), cited casually by Defendants in the case at bar without discussion, the court

explained the applicability and distinctions of the economic loss rule that Defendants here fail to grasp.  Indeed, the purpose for such a distinction makes sense to prevent a defendant to use the very contract it managed to fraudulently procure as a shield.

The failure of Defendants' to pay Plaintiffs under the "note" is not the conduct that comprises the fraudulent inducement, civil theft, conversion and unjust enrichment claims and the predicate claims of theft, fraud and federal wire fraud under the Florida RICO statute.  As the Verified Complaint makes clear, Defendants very conduct of fraudulently inducing Plaintiffs into an agreement, obtaining money and converting money under false pretenses, i.e., (a) financial statement to Plaintiffs on January 31, 2009 certifying that Defendant was not involved in any other lawsuit and representing a 11.6 million dollar net worth, (b) misrepresenting to Plaintiffs the revenues that would be generated at the  OMW event, (c) that the money would be for Disney venue deposits and assuring Plaintiffs that he (Defendant Chisholm) would not use the money unless Disney was secure and then (d) converting such money based on his "discretion," is conduct separate and independent from the breach of "contract" or "note".  Indeed, under those counts, Plaintiffs limit their request for relief to the $200,000.00 that was fraudulently obtained, stolen and converted, not the amount of $240,000.00 represented in the "note."

## V.    CONCLUSION

Based on the foregoing facts and authority, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment in its entirety, and grant such further relief that this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Court CM/ECF docketing system with notice being electronically sent to: Bruce C. Fehr, Esq., *Counsel for Defendants*, Liberis & Associates, P.A., 212 W. Intendencia Street, Pensacola, FL 32501, this **1st** day of **July, 2009.**

Respectfully submitted,

LIEBERMAN DANZ & KRONENGOLD, P.L.
Counsel for Plaintiffs
1301 International Parkway, Suite 140
Fort Lauderdale, FL  33323
Telephone:  (954)385-5400
Facsimile:  (954)385-5444

By: _____/s/ Arianne B. Suarez_____
        Arianne B. Suarez
        Florida Bar No 143529
        asuarez@ldklaw.com
        Scott D. Lieberman
        Florida Bar No. 962678
        slieberman@ldklaw.com