UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STEPHEN BARDFIELD and
CHARLES CARVER,
                 Plaintiffs,

v.

                                               Case No. 3:09cv232/MCR/EMT

CHISHOLM PROPERTIES CIRCUIT
EVENTS, LLC, and
JOHNNY CHISHOLM, individually,
                 Defendants.
_____/

## ORDER, REPORT AND RECOMMENDATION

       In this diversity action Plaintiffs Steven Bardfield ("Bardfield") and Charles Carver ("Carver") (together, "Plaintiffs") assert claims of breach of promissory note; fraud in the inducement; conversion; unjust enrichment; civil theft; breach of contract; and violation of the Florida Racketeer and Corrupt Organization ("RICO") Act, Fla. Stat. § 895.01 *et seq.,* against Defendants Johnny Chisholm ("Chisholm") and Chisholm Properties Circuit Events, LLC ("CPCE") (together, "Defendants"). The matter has been referred to the undersigned by the district court for all pretrial proceedings, including the issuance of preliminary orders, conduct of necessary hearings, and—with respect to any dispositive motions—the filing of a report and recommendation containing proposed findings of fact and conclusions of law (*see* Doc. 50). *See also* N. D. Fla. Loc. R. 72.2(E); 28 U.S.C. § 636(b)(1)(B)(C), and Fed. R. Civ. P. 72(b). Now before this court is the amended motion for summary judgment filed by Defendants (Doc. 30; affidavit at Doc. 31), and Plaintiffs' response in opposition (Doc. 38; declaration at Doc. 39). For the reasons set forth below, the court recommends that the motion for summary judgment be denied.

## I.      Background

Plaintiffs allege the following facts in their complaint, which was filed June 1, 2009 (Doc. 1).  The parties' citizenship is diverse:  Bardfield is a citizen of New York, and Carver is a citizen of North Carolina; CPCE is incorporated in Florida, which is also its principal place of business, and Chisholm, CPCE's managing member, is a citizen of Florida.  Chisholm produces gay "circuit" parties.  Through CPCE, Chisholm produces the One Mighty Weekend ("OMW") event held annually in Orlando, Florida, as part of Orlando's "Gay Days."  In the past the OMW event has consisted of ten separate parties held at various Disney World sites and has attracted approximately 150,000 people to Orlando.

Through an intermediary, Chisholm approached Plaintiffs seeking a $200,000.00 loan to secure Disney venues for the OMW event to be held the weekend of June 4, 2009.  Chisholm told Plaintiffs that the parties historically generated approximately two million dollars in revenue. According to Chisholm, several Disney sites in Orlando would be rented for event parties; Chisholm also told Plaintiffs that he had close ties with Disney through prior business dealings.  Chisholm represented that he needed the $200,000.00 loan at that time because operating money was typically tight immediately prior to the events, although at their conclusion he always had more than enough to pay off his debts.  On January 31, 2009, Chisholm provided Plaintiffs with his personal financial statement showing a net worth of 11.6 million dollars.[1]  Based on Chisholm's representations, Plaintiffs agreed to make a $200,000.00 loan to Defendants to fund and finalize payment for deposits on Disney party venues for the June 2009 OMW event.

On February 20, 2009, CPCE—through Chisholm—executed a promissory note to Plaintiffs for $200,000.00.  An addendum to the promissory note requires CPCE to make monthly payments on the principal amount beginning on April 1, 2009, with each payment equivalent to 25% of collected sales for the OMW event.  The balance was to be repaid no later than June 4, 2009, with

---

[1]  Plaintiffs allege that they later learned the statement contained numerous falsehoods, including that Chisholm indicated he was not involved in any other suits or legal actions.  In fact, Chisholm was a named Defendant in a case filed in this district, DeForest v. Johnny Chisholm Global Events, LLC, Case No. 3:08cv498/MCR/EMT.  The plaintiff in the DeForest case alleges—in connection with an event that was held at Disney's Paris, France, location—a pattern of fraudulent conduct and misappropriation of funds similar to that which Plaintiffs in this case allege.  Additionally, in a case brought against them in state court, McBride Construction, Inc. v. Chisholm, et al., Case No. 2005-CA-002063, Defendants agreed to settle for a certain amount despite not having the funds to pay the settlement.  One of the Defendants, Chisholm Properties of Pensacola, LLC, has since filed for bankruptcy.  Additionally, under the contingent liabilities section of the personal financial statement Chisholm failed to identify any legal claims pending against him.

an "interest" payment (as Chisholm describes the obligation under the note) or "fee" (as Plaintiffs describe the obligation) of $40,000—or 20% of the loan amount of $200,000.00—due by June 7, 2009. Pursuant to an acceleration clause in the note, in the event of default at maturity (or the default of any installment), the entire debt was due at Plaintiffs' option. The parties further agreed that the law of the State of New York would govern. Based on Chisholm's positive financial projections for the 2009 OMW event (including estimated total sales of $910,000.00); his personal financial statement; and the execution of the promissory note and addendum, as well as Chisholm's promise to execute a personal guarantee on the promissory note, Plaintiffs proceeded to wire $200,000.00 to Disney.

On March 18, 2009, after Plaintiffs had sent the funds to Disney, Chisholm informed Plaintiffs that Disney might return the money to them because it had not come directly from CPCE. The next day, March 19, 2009, after Disney in fact had returned the funds to Plaintiffs, Chisholm asked Plaintiffs to wire the funds to CPCE so that he could send the money to Disney himself. In emails and telephone conversations, Chisholm assured Plaintiffs that he would provide them with instructions for wiring the funds to his bank only after he had secured the Disney venues for the OMW parties. Chisholm also asked Plaintiffs to lend him an additional $100,000.00—at the increased "interest" rate or "fee" of 25%—to cover what he described as Disney's increased deposit requirement but Plaintiffs declined. On March 24, 2009, Plaintiffs asked Defendants whether the Disney venues and their loan were at risk due to the status of Defendant's negotiations with Disney and his request for an additional $100,000.00. Chisholm assured Plaintiffs their money would not be released until the Disney venues had been confirmed, and he indicated that he understood the loan was based on the parties being held at Disney sites. On March 25, 2009, Chisholm asked Plaintiffs to consider an additional $50,000.00 loan, and offered to pay a fee of 25% on this amount as well as on the entire loan, but Plaintiffs again declined. On March 30, 2009, Chisholm informed Plaintiffs by email that he had "worked out" the venue issues with Disney and instructed them to proceed with wiring $200,000.00 to CPCE. Carver called Chisholm, who confirmed that the contract and deposit issues with Disney had been resolved and that the $200,000.00 to be sent to Defendants would be forwarded to Disney as soon as it was posted in CPCE's account. Chisholm also promised to provide a wire confirmation to Plaintiffs as proof that Disney had been the final

recipient of their $200,000.00 loan.  Based on Chisholm's assurances, Plaintiffs wired $200,000.00 to Defendants for the purpose of reserving the Disney venues for the June 2009 OMW event.

Within a week of forwarding the funds to Defendants, Plaintiffs heard rumors of problems regarding the Disney sites for the OMW parties.  Although Chisholm did not then volunteer this information to Plaintiffs, they subsequently learned that the OMW event would not take place at Disney venues as Chisholm had represented to them and as he had advertised to the public.  Nor did Chisholm inform Plaintiffs that he had never forwarded their $200,000.00 to Disney.  In response to an April 26, 2009, email from Plaintiffs demanding to know what had become of their money, Chisholm admitted that he had not secured the Disney venues.  Further, Chisholm claimed that, in what he described as an exercise of discretion, he had instead applied the funds to obtain alternate venues and secure additional entertainment for the OMW event, although he has never supplied documentation of these expenditures to Plaintiffs.  On April 30, 2009, Plaintiffs responded by threatening civil and criminal action; to no avail, they also demanded the return of their money. Defendants received credit card sales for the OMW event but failed to make installment payments to Plaintiffs according to the terms of the promissory note/addendum.[2]  On June 1, 2009, Plaintiffs initiated this lawsuit by filing a complaint (Doc. 1) and motion for a temporary restraining order/ preliminary injunction (Doc. 2).

The following is taken from orders and submissions by the parties that are available on the court's electronic docketing system.  On June 3, 2009, the district court issued a temporary restraining order and writ of attachment, conditioned on Plaintiffs' timely posting security with the clerk of court in the amount of $200,000.00, which froze and attached certain funds held in various accounts belonging to Defendants (Doc. 11, amended at Doc. 12).  On June 4, 2009, the clerk received $200,000.00 from Plaintiffs and posted it in the court's registry (*see* Receipt # FLN 3-3159).  CPCE and Chisholm, through counsel, moved to modify the order, but the district court denied their motion (Docs. 17, 18).  On June 9, 2009, the district court conducted a hearing on Plaintiffs' motion for a temporary restraining order and preliminary injunction, which defense

---

[2] Defendants did, however, pay $12,001.00 to Plaintiffs in April 2009 (*see* Doc. 39-1, Bardfield declaration, at 7) (*see also* Doc. 39-1 at 15, indicating actual amount of payment may have been $12,000.00).

counsel—but not Chisholm or any corporate representative of CPCE—attended. The following day, June 10, the district court entered a second amended temporary restraining order which amended the scope of the prior order by freezing and attaching Defendants' assets in specific corporate entities and merchant accounts (Doc. 20). Additionally, based on representations made at the June 9, 2009, hearing that suggested Defendants had violated the amended temporary restraining order, the district court entered an order directing Chisholm to appear and show cause why he should not be held in contempt of the court's June 3, 2009, order [3] (Doc. 21, amended at Doc. 23).

On June 12, 2009, the district court issued an order granting Plaintiffs' motion for preliminary injunction (Doc. 22). As referenced in the order, at the June 9, 2009, hearing Carver testified that the money wired to Defendants had not been placed into a CPCE account and that representations Chisholm had made about pre-event ticket sales—including that December ticket sales had been $147,000, January sales had been $122,00, and May receipts were expected to be $332,000—were untrue. The plaintiff in the DeForest case (*see* n.1, *supra*), Ray DeForest ("DeForest"), also testified at the hearing. According to DeForest's testimony, Defendants engaged in a pattern of activity in connection with the Paris event at a Disney venue which Chisholm produced through another Chisholm enterprise, Chisholm Global Events, LLC ("Global Events") that is similar to the conduct alleged in this case: Chisholm contacted DeForest seeking an investment in a circuit party of $150,000 to be held at a Disney venue. Additionally, Chisholm, by telephone and electronic communications, submitted documents and made oral assurances to the would-be investor that the Paris party would be successful, including estimating that the party would take in two million dollars. Chisholm also indicated he had a special relationship with the Elton John AIDS Foundation which would enable him to secure the services of popular entertainers at low cost. The Paris event in fact resulted in a loss of three million dollars. Although Chisholm had been warned by Disney to expect a turn-out of no more than 300 people, not the projected 12,000 to 15,000, he spent one and one-half million dollars to rent Disney's Paris site and two million dollars

---

[3] The district court noted in its order to show cause that the alleged violations included diverting cash and credit card ticket sales from the accounts and depositories frozen by the temporary restraining order to alternate bank accounts and failing to properly register and document receipts of income derived through ticket sales for the OMW event held in Orlando the weekend of June 4, 2009 (Doc. 23).

to hire singer Mariah Carey. DeForest later learned that $100,000.00 of the money he wired to Chisholm had been deposited in CPCE's account even though Global Events, not CPCE, was the Paris producer.

Finding that the evidence presented at the hearing satisfied the requirements for issuing a preliminary injunction pursuant to the Florida RICO act, the district court granted Plaintiffs' motion for preliminary injunctive relief (Doc. 22). *Inter alia*, the injunction froze and attached funds held in accounts belonging to Chisholm and CPCE in specific depositories (*id.*). The district court's order also directed that the injunction would remain in full force and effect until modified or terminated by the court and that the bond posted by Plaintiffs would remain in place for the duration of the preliminary injunction (*id.*).

On June 16, 2009, Chisholm and CPCE moved to vacate the injunction entered June 12, 2009, but the district court denied their motion (Docs. 25, 40). Defendants also filed a motion for summary judgment on June 16, 2009 (Doc. 24), and an amended motion on June 23, 2009 (Doc. 30). An initial scheduling order was entered June 25, 2009 (Doc. 35).[4] On July 16, 2009, the district court conducted a hearing on the show cause order it had issued to Chisholm; the docket does not reflect any finding of contempt (*see*, *e.g*., Doc. 44, minutes of July 16, 2009, hearing). On July 17, 2009, the district court granted the motion of defense counsel to withdraw, in part directing that Chisholm and CPCE had thirty days in which to retain substitute counsel (Docs. 41, 45). Among other matters, the court noted that if new counsel did not timely appear it would assume that Chisholm had elected to proceed pro se and that CPCE had no intention of defending (Doc. 45). Accordingly, Plaintiffs could move for such relief as they deemed appropriate. To date, no new counsel has appeared for either Chisholm or CPCE.

Plaintiffs filed a motion for entry of default judgment against CPCE on August 18, 2009 (Doc. 49). On August 24, 2009, the district court referred this matter for further proceedings to the undersigned due to Chisholm's pro se status (Doc. 50). Chisholm moved for a protective order and Plaintiffs filed a "unilateral" scheduling report, both on September 10, 2009 (Docs. 51, 52). The

---

[4] Among other directives, the district court instructed that the Rule 26 meeting report was due by August 10, 2009, discovery would close October 23, 2009, and that dispositive motions should be filed by November 11, 2009.

court directed Chisholm to show cause why his motion for protective order should not be denied as untimely filed and also instructed him to inform the court of his efforts to obtain counsel, which documents submitted with Plaintiffs' report suggested were ongoing (Doc. 54). Also, on September 22, 2009, the court directed Plaintiffs to submit a supplemental memorandum in support of their motion for default judgment against CPCE and permitted Plaintiffs to submit evidence, in the form of affidavits or other sworn statements, in support of their request for an award of damages (Doc. 56). Receiving no response from Chisholm, the court denied his motion for protective order and repeated its instruction to advise the court of his efforts to obtain counsel (Doc. 57). Chisholm, once again, did not respond.

On October 5, 2009, Plaintiffs filed an amended motion for default judgment against CPCE (Doc. 58), along with the declaration of Bardfield and an email from Carver to Chisholm dated June 1, 2009 (Doc. 59). Plaintiffs also filed a motion for default judgment against Chisholm individually (Doc. 60), attaching to their motion certain deposition excerpts (Doc. 61). The following day, October 6, 2009, a suggestion of bankruptcy was filed by bankruptcy counsel for CPCE (Doc. 62). The filing noted that CPCE had filed a petition for relief under Title 11 in the United States Bankruptcy Court for the Northern District of Florida, Case No. 09-32069PNS3. It was noted that relief had been ordered on October 6, 2009, and suggested that the action had been stayed by operation of 11 U.S.C. § 362.

The court directed Chisholm to file a response to the motion for default judgment (Doc. 63), but he failed to timely do so.[5] Also, on the basis of the suggestion of bankruptcy, the court entered an order noting that as a consequence of the bankruptcy petition the case was automatically stayed as to CPCE (Doc. 64). Additionally, the court advised that for prudential reasons it would stay the case as to Chisholm as well, thereby removing the case and all pending motions from the active docket of the court; however, the court invited the parties to object to staying the entire case if they wished (*id.*). Upon objection by Plaintiffs (Doc. 65), the court lifted the stay as to Chisholm (Doc.

---

[5] On March 22, 2010, Chisholm submitted to the clerk for filing an untimely response to the motion for default judgment. The court directed that the motion be filed provisionally, pending Chisholm's filing a motion for leave to file the response out-of-time and the court's review of such motion and any response by Plaintiffs (*see* Docs. 74, 75).

66).[6]

## II.    Discussion

Based on the record before it, the court is satisfied that subject matter jurisdiction in this case is proper pursuant to 28 U.S.C. § 1332.  The court further concludes that the record is sufficient to support both personal jurisdiction and venue.  In addressing the pending motion for summary judgment in this case the court applies the substantive law of Florida and federal procedural law. *See* Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) (a federal court sitting in diversity must apply state substantive law and federal procedural law).  Due to the suggestion of bankruptcy, this action is stayed as to CPCE.  The court therefore does not consider the motion for summary judgment vis-a-vis CPCE but rather only in relation to Chisholm, as to whom the action is not stayed.

Chisholm seeks summary judgment on two grounds.  First, Chisholm contends that the promissory note/addendum executed February 20, 2009, is void and unenforceable under the criminal usury laws of both New York and Florida due to the excessive interest rate charged. Therefore, according to Chisholm, based on the absolute defense of usury he is entitled to judgment in his favor on Plaintiffs' breach of promissory note and breach of contract claims.  Second, Chisholm argues that Plaintiffs' other claims, including those in tort and under the Florida RICO statute, are dependent on the illegal note or are barred by Florida's economic loss rule (Doc. 30). Plaintiffs respond that usury law does not apply to the parties' transaction involving a fee, not interest, that in fact was proposed by Chisholm; regardless, under the doctrines of estoppel and waiver Chisholm is barred from raising a defense of usury.  Alternatively, even if the court determines that the transaction was criminally usurious, Plaintiffs should be entitled to the return of the outstanding principal, plus legal interest.  Moreover, Plaintiffs argue, the economic loss rule does not apply to bar their tort and Florida RICO claims since they involve conduct distinguishable from that giving rise to the contract claims.

For summary judgment purposes, other than as noted, the following facts—which are derived

---

[6] Although Docket Entry # 66 does not explicitly reinstate Defendants' ripe motion for summary judgment (Doc. 30), to the extent the motion is brought by Chisholm individually, the motion is reinstated.

from Chisholm's statement of facts filed in support of his motion for summary judgment and Plaintiffs' statement of controverted material facts—are undisputed. Defendants executed the promissory note on February 20, 2009, for the principal loan amount of $200,000.00; the addendum was also executed on February 20, 2009. The "interest" or "fee" was $40,000.00. The note was payable in installments, pursuant to its terms, with the fee or interest and all unpaid principal due on or before June 15, 2009; Plaintiffs submit that the note additionally provides that they were entitled to a percentage of the credit card sales generated by OMW event. Defendants contend the effective annual percentage rate of interest for the note is 92.5662% but Plaintiffs submit the note, by its terms, only provides for a guaranteed fee on the investment, with no annual percentage rate of interest attached to the note or any interest at all.[7] The parties understood that the loan evidenced by the note had to be repaid to Plaintiffs, but Plaintiffs add that it was also understood that they had an interest in the credit card sales generated by the OMW event. Chisholm and CPCE needed the loan due to a temporary cash shortfall prior to the OMW event; in addition to this, Plaintiffs submit, Chisholm represented that all Defendants needed was a loan for the specific purpose of funding Disney venue deposits. Moreover, Chisholm informed Plaintiffs that, based on the event's past success and the current year's strong advance ticket sales, there would be ample funds prior to the event and more than enough to pay off all debts at the conclusion. Chisholm states that he drafted the original note, and Plaintiffs' attorney reviewed it. As requested by Plaintiffs, according to Chisholm, he changed the amount of the fee and the provision for the application of New York law. Chisholm also states that he drafted the addendum, at Plaintiffs' request, which altered the terms of the repayment of the note. Plaintiffs agree that Chisholm drew up the note but state that no change was ever made to the original 20% fee, which Chisholm himself had proposed from the outset of discussions; also, Plaintiffs relied on Chisholm to draft the note and addendum based on his representations that he was experienced in such matters. Plaintiffs also dispute Chisholm's contention that they knowingly, willingly, and purposefully charged and accepted consideration of

---

[7] Chisholm also asks the court to take judicial notice of the interest rate, which he calculates as being 92.5662% per annum (Doc. 30 at 2). Plaintiffs object, stating that the request assumes that the transaction was subject to usury regulation; even if the transaction is appropriately viewed as regulated by usury law, Chisholm failed to provide facts explaining how he arrived at this calculation.

$40,000.00 for the note. Plaintiffs insist they had no intent to make a usurious loan and that in any event the transaction was not regulated by usury law.

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "The mere existence of *some* alleged factual dispute between the parties," however, "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A fact is "material" if it may affect the outcome of the case under the applicable substantive law. *See id.*

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the moving party's pleadings. Instead, the nonmoving party must respond by affidavits or otherwise and present specific allegations showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). In assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. *See* Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *See* Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the nonmoving party.

The court concludes that granting summary judgment in Chisholm's favor, on either of the bases he asserts, is not appropriate. The court will assume, only for the purpose of disposition of the summary judgment motion, that usury law is applicable to the facts surrounding the transaction

between the parties in this case. First, under Florida law,[8] there are four essential elements of a usurious transaction: (1) an express or implied loan; (2) a repayment requirement; (3) an agreement to pay interest in excess of the legal rate; and (4) a corrupt intent to take more than the legal rate for the money loaned. Dixon v. Sharp, 276 So. 2d 817, 819 (Fla. 1973). A borrower who asserts usury as a defense must prove all the elements of usury by clear and satisfactory evidence. *Id.* at 822. Courts should consider substance over form in a usury case because the purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable lender. *See* Jersey Palm-Gross v. Paper, 639 So. 2d 664 (Fla. 4th DCA 1994).

Even assuming that Chisholm had come forward with sufficient evidence to establish that no triable issues exist with respect to the first three elements required to establish a usurious transaction, the court concludes he has failed to do so with respect to the fourth, which requires a corrupt intent to "willfully and knowingly to take more than the legal rate of interest for the money borrowed." *Id.* at 820 (stating, in civil action on note in which defendant alleged usury as a defense, that "usury is largely a matter of intent, and is not fully determined by the fact that the lender actually receives more than law permits, but is determined by existence of a corrupt purpose in the lender's mind to get more than legal interest for the money lent"); Polakoff v. State, 586 So. 2d 385, 389 (Fla. 5th DCA 1991) (stating that "the crime of usury peculiarly requires the existence of a 'corrupt intent' to charge, take or receive more than the legal rate for the use of money loaned . . ."). Corrupt intent is established if the evidence indicates that the lender knowingly charged or received excessive interest, considering all of the surrounding circumstances. Party Yards, Inc. v. Templeton, 751 So. 2d 121, 123 (Fla. 5th DCA 2000) (citing Antonelli v. Neumann, 537 So. 2d 1027, 1028 (Fla. 3d DCA 1988)). As Chisholm acknowledges, under Florida law issues of intent are generally are

---

[8] In his motion Chisholm relies on Fla. Stat. § 687.071, Criminal usury, loan sharking. In pertinent part this statute provides:

> (3) Unless otherwise specifically allowed by law, any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 687.071(3).

Case No. 3:09cv232/MCR/EMT

questions of fact for a jury to decide.  <u>Barnett Bank of West Orlando v. Abramowitz</u>, 419 So. 2d 627 (Fla.. 1982).  Chisholm contends that Plaintiffs' corrupt intent is demonstrated by the facts that Plaintiffs dictated the terms of the note, had their attorney draft a note which on its face provides for interest in the amount of $40,000.00 for the brief loan of $200,000.00 (representing an annual interest rate of 92.5662%), and knew that Defendants were desperate for money to finance the OMW event (*see* Doc. 30 at 4–5; 13–14).  This recitation of the facts, however, is disputed by Plaintiffs, specifically by Bardfield in his declaration.  Bardfield maintains that Chisholm, not Plaintiffs, from the outset dictated the terms of the note and that, based on Chisholm's representation that he was experienced in drawing up loan documents and had counsel at his disposal for assistance, Plaintiffs relied on Chisholm to prepare the paperwork (Doc. 39-1 at 2–3; 4).  Additionally, Chisholm informed Plaintiffs that he had been involved in the past with similar loans, including some under circumstances in which funds were needed prior to the event.  Bardfield further states that, unlike Chisholm, he lacked experience in the sort of transaction Chisholm proposed, as well as experience in drafting the necessary paperwork (*id.* at 3–4).  Also, when Chisholm approached Plaintiffs to borrow an additional $100,000.00 or $50,000.00, it was he who suggested an increased return to Plaintiffs of 25%, instead of the previously agreed-on 20% (*id.* at 5).  Moreover, Bardfield avers, Chisholm never represented that he was desperate for money nor did the intermediary who first approached Plaintiffs about the loan (*id.* at 1); to the contrary, Chisholm boasted of the historic success of the OMW events and his income.  According to what Chisholm allegedly told Plaintiffs, short-term cash flow problems immediately prior to events were a part of his business and the only reason for his cash shortfall at that time was a delay in launching ticket sales (*id.* at 2).  Had Chisholm represented himself as being desperate for money, Plaintiffs contend, they would not have done business with him; in any event, Chisholm made assurances regarding his personal financial situation—including a net worth of 11.8 million dollars—that were strictly contrary to Chisholm's present contention that his position was desperate (*id.* at 4).

Assuming that Florida's usury laws apply to the parties' agreement, the court concludes that, considering all of the surrounding circumstances, *see* <u>Party Yards, Inc.</u>, 751 So. 2d at 123, Chisholm has failed to show that no jury question exists on the issue of whether, in entering into the agreement with Chisholm, Plaintiffs acted with corrupt intent.  If the difference between a lawful transaction

and a usurious one is "the difference between good faith and bad faith," <u>Dixon</u>, 276 So. 2d at 821, Chisholm has failed to demonstrate that no triable issues of fact exist with respect to whether Plaintiffs acted in bad faith. Summary judgment in Chisholm's favor therefore is not appropriate. Assuming that New York's usury laws apply, the court reaches the same conclusion under the laws of that state. New York law similarly requires that a lender must act with the intent to receive or to charge more than the legally permissible rate of interest before a finding of criminal usury is proper. *See* <u>Freitas v. Geddes Savings and Loan Association</u>, 63 N.Y. 2d 254, 262 (1984) (observing that usurious intent is an essential element of usury, which is embodied in the statutory requirement that an unlawful rate of interest be knowingly taken); <u>Hornblower & Weeks, Inc. v. Blue Marlin Breweries, Inc.</u>, 2000 WL 1371329, at *6 (S.D. N.Y. 2000). Thus, even if the usury laws of either Florida or New York apply to the parties' agreement, the court is persuaded that Chisholm has failed to establish that no genuine issues of fact exist which would permit granting summary judgment in his favor based on the argument that the note is unenforceable because it is usurious.

Next, Chisholm argues that Florida's economic loss rule bars Plaintiffs' tort claims (fraudulent inducement; conversion; unjust enrichment; and civil theft) and Florida RICO act claims because each of these counts seeks the same damages as those requested for the "recovery of the loan evidenced by the illegal Note" (Doc. 30 at 11). According to Chisholm, Plaintiffs are asserting these claims in "an attempt to avoid the consequences of having made an illegal and unenforceable loan. Plaintiffs' lack of damage beyond the lost principal and interest represented by the Note, however, preclude them from making an end run around the economic loss rule by seeking to recover that money by some other means" (*id.* at 13).

Florida law provides that a plaintiff in contractual privity with a defendant cannot recover in tort for solely economic damages arising out of the breach of the contract. <u>Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.</u>, 891 So. 2d 532, 536–37 (Fla. 2004). Under this doctrine, known as the economic loss rule, "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent cause of action in tort, [where] such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." <u>Hotels of Key Largo, Inc. v. RHI Hotels, Inc.</u>, 694 So. 2d 74, 78 (Fla. 1997); <u>Jones v. Childers</u>, 18 F.3d 899, 904 (11th Cir. 1994) (observing that under the economic loss rule "parties to a contract can only seek tort damages

if conduct occurs that establishes a tort distinguishable from or independent of [the] breach of contract") (citations and quotations omitted). The policy consideration underlying the rule is to prevent a plaintiff from recovering duplicative damages for the same wrongdoing or, in other words, to "obtain a better bargain than originally made." Indemnity Ins. Co., 891 2d. at 536. Florida law does, however, permit tort actions based on acts that are independent from those that breached the contract. *See* HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1239 (Fla. 1996) (holding that claim for fraudulent inducement constitutes a tort independent from the underlying contract and thus is not barred by the economic loss rule); Alex Hofrichter, P.A. v. Zuckerman & Venditti, 710 So. 2d 127, 129 (Fla. 3d DCA 1998) (recognizing that claims for conversion and civil theft which are independent of a breach of contract are not barred by the economic loss rule); Duncan v. Kasim, Inc., 810 So. 2d 968 (Fla. 5th DCA 2002) (finding that unjust enrichment claim was not barred by the economic loss rule); and All Care Nursing Serv. v. High Tech Staffing, 135 F.3d 740, 745 (11th Cir. 1998) (recognizing that economic loss rule does not bar Florida RICO claim).

   Chisholm reads the economic loss rule too narrowly. The doctrine does not preclude tort and statutory causes of action simply because the plaintiff has also alleged a breach of contract or, as is additionally true in this case, breach of a promissory note. *See* Comptech Intern., Inc. v. Milam Comm. Park, Ltd., 753 So. 2d 1219, 1221–22 (Fla.1999). Plaintiffs allege, and support with undisputed references to Carver's June 9, 2009, hearing testimony and Bardfield's declaration, that Chisholm fraudulently induced them into entering into the agreement to borrow $200,000.00. This evidence reflects that Chisholm provided a financial statement to Plaintiffs that represented his net worth was 11.6 million dollars and falsely certified he was not involved in any other lawsuits. Additionally, Chisholm assured Plaintiffs that significant revenues would be generated by the OMW event at the Disney venues through credit card and advance ticket sales, which would enable him to readily repay the borrowed funds and interest payment or fee. Thereafter, falsely indicating he had secured the Disney venues, Chisholm accepted Plaintiffs' $200,000.00. Rather than forwarding the funds to Disney for the venue deposits, however—the requirement upon which Plaintiffs had conditioned the loan—without informing Plaintiffs or obtaining their consent, Chisholm allegedly spent it to secure other venues and entertainment for the OMW event. Chisholm's conduct in failing

to repay the loan as provided under the terms of the note and addendum, which is the basis for Plaintiffs' contract claims, is distinct from the conduct giving rise to their tort claims. Moreover, as Plaintiffs point out, the relief sought on the tort claims is limited to the amount borrowed of $200,000.00, not the $240,000.00 owing under the note when the $40,000.00 "interest" or "fee" payment is included. The court concludes that on these undisputed facts, entry of summary judgment in Chisholm's favor on the ground the tort claims are barred by the economic loss rule is not warranted.

**III.** **Conclusion**

For all of the foregoing reasons, the court recommends that Chisholm's pending amended motion for summary judgment (Doc. 30), be denied.

Accordingly, it is **ORDERED**:

The docket shall reflect that amended motion for summary judgment jointly filed by Defendants CPCE and Chisholm (Doc. 30) is reinstated as to Defendant Johnny Chisholm only.

And it is respectfully **RECOMMENDED**:

Defendant Johnny Chisholm's amended motion for summary judgment (Doc. 30) be **DENIED**.

At Pensacola, Florida this 25th day of March 2010.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**